Not for Publication

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| RHONDA KLASS, | : | |
| | : | |
| Plaintiff, | : | Civil Action No. 15-6510 (ES) (MAH) |
| | : | |
| v. | : | OPINION |
| | : | |
| RELIANCE STANDARD LIFE | : | |
| INSURANCE COMPANY and MATRIX | : | |
| ABSENCE MANAGEMENT, | : | |
| | : | |
| Defendants. | : | |

SALAS, DISTRICT JUDGE

Plaintiff Rhonda Klass ("Plaintiff" or "Ms. Klass") filed a Complaint against Defendants

Reliance Standard Life Insurance Company ("Reliance") and Matrix Absence Management Inc.

("Matrix") (collectively, "Defendants"), alleging wrongful denial of long-term disability ("LTD")

benefits pursuant to § 502(a)(1)(B) of the Employee Retirement Income Security Act ("ERISA"),

29 U.S.C. § 1132(a)(1)(B). (D.E. No. 1, ("Compl.")). The parties have filed cross-motions for

summary judgment. (D.E. Nos. 32 & 35). Having considered the submissions in support of and

in opposition to the parties' motions, the Court decides this matter without oral argument. *See*

Fed. R. Civ. P 78(b).[1] For the reasons set forth below, the Court DENIES Plaintiff's motion for

summary judgment and GRANTS Defendants' cross-motion.

---

[1] The Court refers to (i) D.E. No. 33-1, Brief in Support of Plaintiff's Motion for Summary Judgment as "Pl.
Mov. Br."; (ii) D.E. No. 35, Combined Memorandum of Law in Opposition to Plaintiff's Motion for Summary
Judgment and in Support of Defendants' Cross-Motion for Summary Judgment as "Def. Mov. & Opp. Br."; (iii) D.E.
No. 36, Brief in Opposition to Defendants' Motion for Summary Judgment and in Further Support of Plaintiff's
Motion for Summary Judgment as "Pl. Rep. & Opp. Br."; (iv) D.E. No. 37, Reply Brief in Support of Defendants'
Cross-Motion for Summary Judgment as "Def. Rep. Br."; (v) D.E. No. 33, Plaintiff's Statement of Material Facts Not
in Dispute as "Pl. SMF"; (vi) D.E. No. 34, Combined Response to Plaintiff's Statement of Material Facts Not in

## I.    BACKGROUND[2]

***The Parties.***  Plaintiff, a fifty-seven-year-old woman, worked as a database marketing manager at Toys "R" Us from 2008 until February 17, 2014.  (Pl. SMF ¶ 10; D.E. No. 32-4 at 3). Reliance is an insurance company that provided disability insurance to eligible Toys "R" Us employees (including Plaintiff) under Group Policy No. LSC 100,002 (D.E. No. 32-3, the "Policy" or "Plan" at 1-33).  (Pl. SMF ¶ 1; Def. SMF ¶¶ 1-2 at 25).  Matrix is Reliance's third-party LTD claims administrator.  (Pl. SMF ¶ 4).  It was also the administrator for Toys "R" Us's self-insured salary-continuation plan (i.e., short-term disability plan) and approved Plaintiff's benefits under that plan.  (*Id.* ¶¶ 8, 20-21, 27).

***The Policy.***  Under Plaintiff's Policy, an employee is totally disabled when she cannot, as a result of an injury or sickness, perform the "material duties of [her] Regular Occupation." (Policy at 10).  "Regular Occupation" is "the occupation the [employee] is routinely performing when Total Disability begins." (*Id.*).  The Policy further states that Reliance "will look at the [employee's] occupation as it is normally performed in the national economy, and not the unique duties performed for a specific employer in a specific locale." (*Id.*).

Dispute and Counter-Statement of Material Facts in Support of Defendants' Cross-Motion for Summary Judgment as "Def. SMF"; and (vii) D.E. No. 36-1, Plaintiff's Response to Defendant[s'] Statement of Facts as "Pl. RSMF."  Unless otherwise indicated, all internal citations and quotation marks are omitted, and all emphasis is added.

[2]       The Court distills these facts from the parties' statements of material facts and the administrative record (D.E. Nos. 32-3 through 32-13) accompanying the pending motions for summary judgment.  Unless otherwise noted, these background facts are undisputed.  Additional facts are provided elsewhere in this Opinion as relevant to the Court's analysis.

***Plaintiff's Medical History and Defendants' Denial of Her LTD Claim.*** Prior to leaving work on disability, Plaintiff began experiencing back pain, stiffness, and neck pain while sitting. (Pl. SMF. ¶ 12).

<u>Plaintiff Seeks Medical Evaluation</u>

- On February 17, 2014, Plaintiff visited her primary care group, Hudson Valley Medical Associates, where she saw Mara Gluck-Shats, M.D. (D.E. No. 32-8 at 44-48). Dr. Gluck-Shats found decreased range of motion in Plaintiff's neck and lower back, and prescribed a muscle relaxer in combination with a non-steroidal anti-inflammatory medication. (*Id.*). But Dr. Gluck-Shats also noted, "Neck: Normal range of motion. Neck supple." (*Id.* at 46). Dr. Gluck-Shats then wrote a letter stating that Plaintiff was under her care and would return to work on February 25, 2014. (D.E. No. 32-6 at 36).

- On February 26, 2014, Plaintiff returned to Hudson Valley Medical Associates, visiting Rosana Millos, M.D. (Pl. SMF. ¶ 16). Plaintiff reported bilateral lower back pain radiating into the thorax and neck with radiation down the left leg, neck pain, numbness in the right arm, and insomnia. (*Id.*). She reported that the pain was constant and that "[g]etting up out of a chair or using the computer makes the pain worse." (D.E. No. 32-8 at 40). Dr. Millos performed a physical examination and noted right trapezius spasm and tenderness to palpation. (Pl. SMF. ¶ 16). To address Plaintiff's muscle spasms and insomnia, Dr. Millos prescribed Xanax, Valium, and a TENS unit. (*Id.*). She also wrote a letter stating that Plaintiff "is currently unable to work due to great discomfort" and excused her from work through March 11, 2014. (D.E. No. 32-6 at 35).

- On February 28, 2014, in support of Plaintiff's short-term disability claim, Dr. Millos certified to Matrix that Plaintiff was unable to work from February 25 through March 11, 2014. (*Id.* at 30-32). As to the factors that prevented Plaintiff from working, Dr. Millos noted "significant pain on sitting; significant pain under movement; difficulty holding up her neck." (*Id.* at 31). Dr. Millos's certification further stated that Plaintiff could not sit or do repetitive work for more than "0-1 hours per day" and that the "prognosis for expected recovery" is "2-4 weeks." (*Id.* at 31-32).

- On March 5, 2014, Dr. Millos again certified that her findings of Plaintiff's disability were substantiated by right trapezius spasm and tenderness, along with lower back paraspinal tenderness. (*Id.* at 46). Plaintiff was expected to recover (i.e., return to work) on March 25, 2014. (*Id.*).

- On April 10, 2014, Plaintiff returned to Hudson Valley Medical Associates, seeing board-certified internist Ira Katz, M.D. (Pl. SMF ¶ 22). Plaintiff reported that her condition had been gradually worsening, with back spasms and neck pain if she maintained the same position for

too long. (*Id.*). She complained of (i) pain in the thoracic spine, lower back, left side, right side, and gluteal region; and (ii) a burning and tingling pain radiating to her left and right thighs and knees bilaterally. (*Id.*). Dr. Katz diagnosed Plaintiff with (among other things) back pain, trapezius muscle spasm, and thoracic back pain and prescribed a muscle relaxer and pain medication. (*Id.* ¶ 23).

- On June 13, 2014, Plaintiff again saw Dr. Katz, who noted that her pain had become a chronic problem; specifically, Plaintiff was experiencing (i) lumbar and right side neck pain; (ii) bilateral paraspinal and CVA tenderness; and (iii) abnormal gait with a slight limp. (*Id.* ¶ 24). Dr. Katz provided the following additional notes: (i) "Neck: Normal range of motion, Neck supple"; (ii) "Musculoskeletal: Normal range of motion. She exhibits no edema"; and (iii) "Neurological: She is alert and oriented to person, place and time. She has normal reflexes. She displays normal reflexes. No cranial nerve deficit. Gait (slight limp) abnormal. Coordination normal." (D.E. No. 32-8 at 26).

- On July 30, 2014, Plaintiff underwent MRIs of her cervical, thoracic, and lumbar spine. (Pl. SMF ¶ 25).

- On July 31, 2014, at Dr. Katz's recommendation, Plaintiff visited orthopedic surgeon Patrick J. Murray, M.D., who noted tenderness in the lumbosacral area; limited lumbosacral movement in all directions with pain elicited by motion; and decreased sensation in the right arm. (*Id.* ¶ 26). He (i) diagnosed her with neck sprain, lumbar sprain, lumbar disc degeneration, and cervical spondylosis; (ii) recommended physical therapy; and (iii) added cyclobenzaprine HCL 10 mg three times per day for ten days to Plaintiff's regimen. (*Id.*). Dr. Murray additionally noted that (i) gait and stance were normal; (ii) muscle tone was normal; (iii) intrinsic muscles of the neck showed no weakness; and (iv) he observed no weakness of the shoulders, elbows, wrists, fingers, or knees. (D.E. No. 32-8 at 13).

### *Plaintiff Submits LTD Claim*

- Also on July 31, 2014, Plaintiff submitted a claim for LTD benefits under the Policy. (Pl. SMF ¶ 28). Matrix had previously approved Plaintiff's claim for short-term disability benefits. (*Id.* ¶¶ 20-21, 27).

- In support of Plaintiff's LTD claim, Dr. Katz submitted an Attending Physician Statement ("APS"), reporting that Plaintiff (i) can sit, stand, walk and drive each for one-to-three hours in an eight-hour day; (ii) can frequently drive and use foot controls; (iii) can occasionally bend, squat, climb, reach above shoulders, kneel and crawl, lift or carry ten pounds, and carry small objects (a level consistent with sedentary work); (iv) was not limited in her ability to relate to other people beyond giving and receiving instructions; and (v) was moderately limited in her ability to perform simple and repetitive tasks as well as complex and varied tasks. (D.E. No.

32-6 at 68-69).  Dr. Katz did not indicate when Plaintiff would be able to return to work.  (*Id.* at 69).

*Matrix Reviews and Denies Plaintiff's LTD Claim*

- On August 12, 2014, Nurse Marianne Lubercht (tasked with reviewing Plaintiff's LTD claim) noted, "We lack information to assess function. . . .  Please obtain actual treatment notes from 2/11/14 to 4/10/14 from Dr. Katz and records of any other providers not mentioned above, and return for completion of evaluation."  (D.E. No. 32-5 at 11).

- Also on August 12, 2014, Matrix conducted an initial phone interview with Plaintiff.  (Pl. SMF ¶ 31).  She reported using a back brace and TENS unit (which she purchased on her own) and was doing home exercises, physical therapy, and taking medications as prescribed by her doctors.  (*Id.* ¶ 29).  When asked about driving restrictions, Plaintiff indicated that she self-restricted to driving approximately fifteen minutes without taking a break.  (*Id.*).

- On August 21, 2014, Dr. Katz examined Plaintiff and diagnosed her with fibromyalgia, with secondary diagnoses of low back pain, cervical pain, insomnia, trapezius muscle spasm, thoracic pain, and radiculopathy in the upper and lower extremities.  (*Id.* ¶ 36).

- On August 28, 2014, Nurse Lubrecht again reviewed Plaintiff's file and noted that the "[r]esidual functional capacity form completed by Dr. Katz . . . is not supported by the records.  Additional information does not change prior opinion.  Sedentary restrictions and limitations with no stoop or crouch are supported date of loss ongoing."  (D.E. No. 32-5 at 12-13).

- On September 8, 2014, Matrix denied Plaintiff's LTD claim, reasoning that based on the information provided by Dr. Katz and Dr. Murray, Plaintiff "retain[ed] the ability to perform the material duties of [her sedentary] occupation."  (Pl. SMF ¶ 45; D.E. No. 32-6 at 4-7).  Moreover, based on its surveillance of Plaintiff's activities, Matrix "concluded that [her] current activity level exceeds [her] claimed abilities."  (D.E. No. 32-6 at 4-7).

*Plaintiff Continues to Seek Medical Treatment*

- On September 30, 2014, Plaintiff visited board-certified rheumatologist Alfred Becker, M.D., who noted "tender spot in the classical distribution of Fibromyalgia" and that Plaintiff "appears to be doing relatively well with the current medical program."  (Pl. SMF ¶ 47).  In a letter to Dr. Katz, Dr. Becker stated, "I explained to the patient that the diagnosis of Fibromyalgia is a very good bet."  (*Id.*).

- Also on September 30, 2014, at the recommendation of Dr. Katz, Plaintiff visited neurologist Lyle Dennis, M.D., who noted that "[i]t is my impression the patient has chronic neck and back pain with some discogenic changes.  I agree this could fit more with a fibromyalgia diagnosis."  (D.E. No. 32-10 at 49).

- On November 26, 2014 and December 2014,[3] Plaintiff visited Richard Podell, M.D., M.P.H., an expert in treating patients with fibromyalgia and Chronic Fatigue Syndrome/Systemic Exertional Intolerance Disease ("CFS/SEID"). (Pl. SMF ¶ 49). In a January 10, 2015 letter to Plaintiff's counsel, Dr. Podell stated that (i) he is treating Plaintiff for fibromyalgia and diffuse spinal arthritis; (ii) Plaintiff also satisfies the Center for Disease Control criteria for Chronic Fatigue Syndrome; (iii) he administered the Symptom Severity Score questionnaire (on which Plaintiff scored a maximum of 12 out of 12) and Widespread Pain index questionnaire (on which Plaintiff scored a maximum of 19 out of 19); (iv) he performed a trigger point examination, which revealed "multiple abnormalities consistent with severe and functionally limiting musculoskeletal microspasm"; (v) he performed a tender point examination; (vi) he had Plaintiff perform a typing test to record her pain; and (vii) he administered the Fibromyalgia Impact Questionnaire Revised and concluded that Plaintiff's score is "consistent with severe functional limitations and not being able to work on a regular basis at any job." (D.E. No. 32-11 at 4-23). Dr. Podell diagnosed Plaintiff with fibromyalgia, which he found "severely limiting and well documented"; CFSD/SEID secondary to fibromyalgia; severe spinal arthritis/disc disease, which "contributes to her chronic pain and Fibromyalgia pain sensitivity"; and impaired sleep secondary to severe chronic pain. (*Id.* at 17-18). He further concluded that Plaintiff's "physical limitations preclude her from performing any job that is reasonably available in the economy." (*Id.* at 18).

- On December 16, 2014, Plaintiff returned to Dr. Becker, who noted (among other things) that (i) Plaintiff "has no objective muscle weakness or pain"; (ii) she "does have tender spot in the classical distribution of fibromyalgia, but no active inflammatory arthropathy is appreciated"; (iii) "[n]eurological examination is within normal limits"; and (iv) her "laboratory tests performed by the specialist were all negative." (D.E. No. 32-10 at 61). Dr. Becker "recommended to her to try to find some form of discipline action, whereby she does more than just sit all day in front of the television set." (*Id.*).

*Plaintiff Unsuccessfully Appeals Matrix's Denial to Reliance*

- On March 2, 2015, Plaintiff appealed Matrix's denial of her LTD claim to Reliance. (Pl. SMF ¶ 60). Reliance requested an independent medical peer review from Ira Weisberg, M.D. (*Id.*).

- On April 6, 2015, Dr. Weisberg issued a report in which he (i) listed the documents he reviewed (including Dr. Podell's report); (ii) recounted a telephone conversation with Dr. Millos; (iii) noted that Plaintiff's MRI "was found to have a syrinx in the thoracic spine but the neurologist did not feel it was causing her pain"; (iv) stated that he "believe[d] the prognosis is good if [Plaintiff] returns to a working environment"; and (v) opined that Plaintiff had "the work

---

[3]     It is unclear from Dr. Podell's letter whether he saw Plaintiff on December 14 or 22, 2014. (D.E. No. 32-11 at 5, 10).

capacity on a full time consistent basis on or around the 08/17/14 and going forward" with certain restrictions (as outlined in his report).  (D.E. No. 32-11 at 47-56).

- On April 15, 2015, Reliance upheld Matrix's decision to deny Plaintiff's LTD claim.  (D.E. No. 32-6 at 13-19).  After considering "all of the medical evidence in the claim file," Reliance "concluded that the information did not substantiate a physical or mental condition at a level of severity precluding Ms. Klass from performing the full-time material duties of a *sedentary* occupation."  (*Id.* at 13).

- On August 1, 2015, Plaintiff submitted a supplemental report from Dr. Podell and requested that Reliance reconsider its adverse determination.  (Pl. SMF ¶¶ 67-68).  Reliance, however, upheld its denial on August 27, 2015.  (D.E. No. 32-6 at 23).

*Surveillance of Plaintiff's Actions.*  To evaluate the veracity of Plaintiff's claims, Defendants hired Marshall Investigative Group ("Marshall") to follow Plaintiff.  (Pl. SMF ¶ 32). On August 20, 2014, Marshall observed Plaintiff going to physical therapy, a reflexology appointment, entering a hearing aid business, and getting gas.  (*Id.* ¶ 34).  The car rides between these locations were from two-to-fourteen minutes.  (*Id.*).  On August 21, 2014, Marshall gathered footage of Plaintiff going to physical therapy twice, with car rides lasting six-to-eleven minutes. (*Id.* ¶ 37).  That same day, Marshall also observed Plaintiff riding as a passenger from her home in Pamona, New York, to Wildwood, New Jersey.  (*Id.* ¶ 38).  Maureen Murray (a Matrix employee) wrote to a Marshall representative, "I really hope she is giving [Marshall] some good video to dispute her claims."  (*Id.* ¶ 35).

*Vocational Specialist.*  In accordance with the terms of the Policy, a Reliance vocational specialist reviewed Plaintiff's Toys "R" Us job description and determined that (as performed in the national economy) Plaintiff's occupation was a combination of "Database Administrator" and "Manager, Sales," classified as a sedentary occupation.  (D.E. No. 32-8 at 57-62; Def. Mov. & Opp. Br. at 25).

*Procedural History.*  After exhausting her administrative remedies, Plaintiff initiated this lawsuit on August 31, 2015, alleging wrongful denial of LTD benefits pursuant to § 502(a)(1)(B)

of ERISA, 29 U.S.C. § 1132(a)(1)(B).  (*See* Compl.).  The parties filed cross-motions for summary judgment.  (D.E. Nos. 32 & 35).  The matter is now ripe for resolution.[4]

## II.    LEGAL STANDARDS

### A.  Summary Judgment

Summary judgment is appropriate under Federal Rule Civil Procedure 56(c) when the moving party demonstrates that there is no genuine issue of material fact, and the evidence establishes the moving party's entitlement to judgment as a matter of law.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  "[S]ummary judgment is essentially put up or shut up time for the non-moving party: the non-moving party must rebut the motion with facts in the record and cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument."  *Berckeley Inv. Group, Ltd. v. Colkitt*, 455 F.3d 195, 201 (3d Cir. 2006).

A factual dispute is genuine if a reasonable jury could return a verdict for the non-moving party, and it is material if, under the substantive law, it would affect the outcome of the suit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  "In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence is to be believed and all justifiable inferences are to be drawn in his favor."  *Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004).

"When the moving party has the burden of proof at trial, that party must show affirmatively the absence of a genuine issue of material fact: it must show that, on all the essential elements of

---

[4]    The Court is in receipt of Plaintiff's letter seeking leave to file a request for judicial notice of a favorable decision from the Social Security Administration in consideration of Plaintiff's motion.  (D.E. No. 38).  Because the Court's inquiry into the reasonableness of Defendants' decision is "based upon the facts as known to the administrator at the time the decision was made," it will not consider information that was unavailable to Defendants at that point in time.  *Duda v. Standard Ins.*, 649 F. App'x 230, 239 (3d Cir. 2016).  Therefore, Plaintiff's request is denied.

its case on which it bears the burden of proof at trial, no reasonable jury could find for the non-moving party." *In re Bressman*, 327 F.3d 229, 238 (3d Cir. 2003). "[W]ith respect to an issue on which the nonmoving party bears the burden of proof . . . the burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325.

Once the moving party has satisfied its initial burden, the party opposing the motion must establish that a genuine issue as to a material fact exists. *Jersey Cent. Power & Light Co. v. Lacey*, 772 F.2d 1103, 1109 (3d Cir. 1985). The party opposing the motion for summary judgment cannot rest on mere allegations and instead must present actual evidence that creates a genuine issue as to a material fact for trial. *Anderson*, 477 U.S. at 248; *Siegel Transfer, Inc. v. Carrier Express, Inc.*, 54 F.3d 1125, 1130-31 (3d Cir. 1995). "[U]nsupported allegations . . . and pleadings are insufficient to repel summary judgment." *Schoch v. First Fid. Bancorporation*, 912 F.2d 654, 657 (3d Cir. 1990); *see also* Fed. R. Civ. P. 56(e) (requiring the nonmoving party to "set out specific facts showing a genuine issue for trial"). "A nonmoving party has created a genuine issue of material fact if it has provided sufficient evidence to allow a jury to find in its favor at trial." *Gleason v. Norwest Mortg., Inc.*, 243 F.3d 130, 138 (3d Cir. 2001).

If the nonmoving party has failed "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial . . . there can be 'no genuine issue of material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Katz v. Aetna Cas. & Sur. Co.*, 972 F.2d 53, 55 n.5 (3d Cir. 1992) (quoting *Celotex*, 477 U.S. at 322-23).

Finally, "[t]he summary judgment standard does not change when . . . the parties have filed cross-motions for summary judgment." *Wimberly Allison Tong & Goo, Inc. v. Travelers Prop. Cas. Co. of Am.*, 559 F. Supp. 2d 504, 509 (D.N.J. 2008) (*citing Appelmans v. City of Philadelphia*, 826 F.2d 214, 216 (3d Cir. 1987), *aff'd* 352 F. App'x 642 (3d Cir. 2009). "Such motions [] are no more than a claim by each side that it alone is entitled to summary judgment . . . ." *Transportes Ferreos de Venezuela II Ca v. NKK Corp.*, 239 F.3d 555, 560 (3d Cir. 2001).

## B. ERISA Standard of Review

A denial-of-benefits claim brought pursuant to ERISA is typically reviewed under a de novo standard. *Estate of Schwing v. Lilly Health Plan*, 562 F.3d 522, 525 (3d Cir. 2009). But where "the plan grants discretionary authority to the administrator or fiduciary to determine eligibility for benefits or interpret the terms of the plan," as it does here, the Court reviews the administrator's exercise of that authority under an "arbitrary and capricious standard." *Id.; see also Miller v. Am. Airlines, Inc.*, 632 F.3d 837, 844 (3d Cir. 2011).[5] This standard applies to both findings of fact and matters of plan interpretation. *Fleisher v. Standard Ins.*, 679 F.3d 116, 121 (3d Cir. 2012).

A decision is arbitrary and capricious "if it is without reason, unsupported by substantial evidence or erroneous as a matter of law." *Miller*, 632 F.3d at 845. Substantial evidence exists when there is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Fleisher*, 679 F.3d at 121. Consequently, a court's scope of review is narrow, and it "is not free to substitute its own judgment for that of the defendants in determining eligibility for plan benefits." *Quinlan v. Reliance Standard Life Ins.*, No. 13-7052, 2015 WL 519430, at *6

---

[5] The Policy grants Reliance "the discretionary authority to interpret the Plan and the insurance policy to determine eligibility for benefits." (Policy at 15). And the parties agree that Defendants' decision to deny Plaintiff's LTD claim should be reviewed under an arbitrary and capricious standard. (Pl. Mov. Br. at 19; Def. Mov. & Opp. Br. at 8).

(D.N.J. Feb. 9, 2015) (quoting *Abnathya v. Hoffmann–La Roche, Inc.*, 2 F.3d 40, 45 (3d Cir. 1993)). "Indeed, a decision may be disturbed only if it was unreasonable." *Aristone v. N.J. Carpenter's Pension Fund (Plan No. 001)*, No. 15-5709, 2016 WL 4265718, at *6 (D.N.J. Aug. 12, 2016). Moreover, "deference should be given to the lion's share of ERISA claims." *Dukes v. Liberty Life Assur. of Boston*, No. 14-0806, 2015 WL 4132975, at *3 (D.N.J. July 7, 2015).

When determining whether the decision to terminate benefits was arbitrary or capricious, a court must focus on the final, post-appeal decision. *Funk v. CIGNA Grp.*, 648 F.3d 182, 181 n.11 (3d Cir. 2011), *abrogated on other grounds by Montanile v. Bd. of Tr. of Nat'l Elevator Indus. Health Benefit Plan*, 136 S. Ct. 651 (2016). While a court may consider pre-final decisions as evidence of the decision-making process that yielded the final decision, "those decisions ought merely to inform a court's review of the final decision." *Id.* In addition, the Court is limited to evidence that was before the plan administrator at the time of the decision being reviewed. *Aristone*, 2016 WL 4265718, at *2 n.1.

Finally, in reviewing a denial-of-benefits claim, a court must take account of several different factors and reach a result by weighing all of those factors. *Estate of Schwing*, 562 F.3d at 526. It should consider both structural and procedural concerns. *Uqdah v. Unum Life Ins. Co. of Am.*, No. 14-6367, 2015 WL 5572678, at *5 (D.N.J. Sept. 21, 2015) (citing . *Estate of Schwing*, 562 F.3d at 525-26). A structural inquiry "focuses on the financial incentives created by the way the plan is organized, i.e., whether there is a conflict of interest," and a procedural inquiry addresses "how the administrator treated the particular claimant." *Miller*, 632 F.3d at 845.

## III.  DISCUSSION

### A.  Structural Conflict of Interest

There is a presumed structural conflict of interest where, as here, the insurance company both reviews claims and pays out benefits. *Estate of Schwing*, 562 F.3d at 526.  "The existence of a conflict of interest, however, is not dispositive." *Uqdah*, 2015 WL 5572678, at * 5 (citing *Estate of Schwing*, 562 F.3d at 525-27).  Rather, it is just one factor that a court must consider when determining whether the administrator was arbitrary or capricious. *Metro. Life Ins. v. Glenn*, 554 U.S. 105, 116 (2008) (holding that "conflicts are but one factor among many that a reviewing judge must take into account").

Plaintiff's submissions in support of her motion are replete with allegations of bias.[6]  Yet Plaintiff makes only one specific assertion to support her numerous allegations: that Defendants "were going to take every step possible to deny her claim . . . to ensure that they would not be fiscally responsible . . . ." (Pl. Mov. Br. at 1).  And rather than proffering evidence of how this presumed conflict affected her claim, Plaintiff merely states that "Reliance was determined to deny Ms. Klass' claim from the start, with Ms. Murray stating 'I really hope she is giving [Marshall] some good video to dispute her claims.'" (*Id.* at 21).  She then highlights that "Reliance/Matrix" approved her salary continuation benefits for twenty-six weeks prior to the LTD start date "for which there were no financial consequences to Reliance . . . ." (*Id.* at 9).

The Court is unpersuaded by Plaintiff's argument.  As noted elsewhere in this Opinion, video surveillance is a proper method of investigating disability insurance claims. *See, e.g., Mozdzierz v. Aetna Life Ins.*, No. 06-2652, 2014 WL 7177326, at *13 (E.D. Pa. Dec. 17, 2014)

---

[6]      (*See, e.g.*, Pl. Mov. Br. at 1 ("Defendants carried their blatant bias all the way through the denial that forced Ms. Klass into Court."); *id.* at 19 (arguing that there was "blatant bias in the claims process"); *id.* at 33 (stating that "this claim was infected with bias"); *id.* (seeking retroactive benefits because remanding the case back to "the biased fiduciary" would be a "useless formality")).

("Surveillance is a legitimate investigatory tool used by plan administrators."). And Ms. Murray's statement (though insensitive) does not, by itself, render Defendants' decision arbitrary and capricious. Moreover, it is undisputed—as Plaintiff notes—that Ms. Murray worked for Matrix (who was not financially responsible for paying out Plaintiff's benefits). (*See* Pl. Rep. & Opp. Br. at 38). It was also Matrix—not Reliance—who approved Plaintiff's salary continuation immediately prior to her LTD start date. (Pl. SMF ¶¶ 20-21, 27). Thus, as a factor in this Court's determination, the presumed structural conflict of interest will receive little weight.

### B. Procedural Conflict of Interest

The Court may consider a variety of factors during its procedural inquiry, including: (i) a reversal of a benefits determination without additional evidence; (ii) a disregard of opinions previously relied upon; (iii) a self-serving selectivity in the use of evidence or reliance on self-serving paper reviews of medical files; (iv) a reliance on the opinions of nontreating physicians over treating physicians without explanation; (v) a reliance on inadequate information or incomplete investigation; (vi) failure to comply with the notice requirements of Section 504 of ERISA; (vii) failure to analyze all relevant diagnoses; and (viii) failure to consider Plaintiff's ability to perform actual job requirements. *Uqdah*, 2015 WL 5572678, at *6; *Moustafa v. Reliastar Life Ins.*, No. 15-2531, 2016 WL 6662685, at *7 (D.N.J. Nov. 8, 2016). Plaintiff's motion addresses (among other things) the third, fourth, seventh, and eighth factors.

### i. *Defendants' Reliance on the Opinions of Nontreating Physicians Over Treating Physicians Without Explanation*

#### a. *The Parties' Arguments*

Plaintiff argues that Defendants' decision to deny her LTD benefits was arbitrary and capricious because they failed to provide any explanation for rejecting the opinions of her treating physicians. (Pl. Mov. Br. at 22-23). Specifically, Plaintiff alleges that (i) Nurse Lubercht

"concluded without [explanation] that the documentation from Ms. Klass and her treating physicians did not support disability"; (ii) Dr. Weisberg, "whose CV reveals no expertise or special knowledge of Fibromyalgia or CFS/SEID," "similarly failed to provide an explanation as to why he found Ms. Klass' treating physicians not to be credible"; and (iii) "Defendants' appeal denial letter offered no explanation as to why it was favoring the non-treating opinion of Dr. Weisberg over that of Dr. Podell or any of Ms. Klass' other treating physicians." (*Id.* at 23).

In opposition, Defendants contend that "Dr. Weisberg specifically addressed the reasons why he rejected Dr. Podell's opinion" and "Reliance did in fact explain the basis for its decision." (Def. Mov. & Opp. Br. at 13). They also note that courts may not "impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation." (*Id.* at 14 (citing *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003))).

### b. Analysis

A plan administrator is not required to give greater weight to the opinions of a claimant's treating physicians as compared to those of independent medical examiners. *Black & Decker*, 538 U.S. at 834;[7] *see also Bluman v. Plan Admin'r & Trs. for CNA's Integrated Disability Program*, 491 F. App'x 312, 316 (3d Cir. 2012) (rejecting plaintiff's argument that the administrator erred by relying on the opinion of nontreating doctor who had only reviewed plaintiff's medical records). Although an administrator may not "refuse to credit a claimant's reliable evidence" (which includes the opinion of a treating physician), the administrator may credit "reliable evidence that

---

[7]    In *Black & Decker*, the Supreme Court distinguished ERISA disability cases from Social Security disability claims (in which the opinions of treating physicians are given great, if not controlling, weight). 538 U.S. at 829-32. The Court acknowledged that treating physicians may have a better opportunity to know and observe the patient over a period of time as compared to one-time consultants, but nevertheless held that "courts have no warrant to require administrators automatically to accord special weight to the opinions of a claimant's physician." *Id.* at 829-34.

conflicts with a treating physician's evaluation." *Black & Decker*, 538 U.S. at 834; *Stratton v. E.I. DuPont de Nemours & Co.*, 363 F.3d 250, 258 (3d Cir. 2004) (upholding district court's finding that insurer did not act arbitrarily by refusing to credit a report from patient's treating physician).

The Court notes that both Dr. Weisberg's report and Reliance's denial letter offered explanations for their conclusions.[8]  And if those conclusions are based on substantial evidence (i.e., "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion"), the Court's inquiry ends.  *Fleisher*, 679 F.3d at 121.  The Court cannot substitute its own judgment for that of Defendants, *see Quinlan*, 2015 WL 519430, at *6., nor can it "impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation," *Black & Decker*, 538 U.S. at 834.

Dr. Weisberg's conclusion was based, in part, on a discussion with Dr. Millos.  (D.E. No. 32-11 at 49).  According to his report, Dr. Millos told him that (i) she "felt that [Plaintiff] was not totally incapacitated"; (ii) "patients with fibromyalgia generally are not totally impaired from working"; (iii) Plaintiff "did not appear to be in significant distress [from] her back and neck pain"; and (iv) "[s]he did not see a reason why the insured could not participate in a sedentary/light type of physical activity."  (*Id.*).  In addition to considering notes from Plaintiff's treating physicians, Dr. Weisberg considered the results of the video surveillance, noting that (i) Plaintiff "participated in activities that showed her walking in a fluid and unrestricted manner"; (ii) "[t]here was no notation of having signs of distress, i.e.[,] holding her neck or back, grimacing[,] etc."; (iii) "[s]he did not use an assistive device"; and (iv) "she had remained in a vehicle for about 4 hours."  (*Id.*

---

[8]      When determining whether the decision to terminate benefits was arbitrary or capricious, a court must focus on the final, post-appeal decision.  *Funk*, 648 F.3d at 181 n.11.  Here, Reliance's final decision was premised primarily on Dr. Weisberg's opinions.  (*See* D.E. No. 32-6 at 13-19).  As such, Nurse Lubercht's conclusions (though they inform this Court's review of Reliance's final decision) are not accorded significant weight.  *See Funk*, 648 F.3d at 181 n.11 (While a court may consider pre-final decisions as evidence of the decision-making process that yielded the final decision, those decisions "ought merely to inform a court's review of the final decision.").

at 53). Dr. Weisberg further explained that (i) the "diagnosis of fibromyalgia was only mentioned after Dr. Dennis and Becker did not find anything significant on [the] physical exam"; and (ii) while Dr. Podell's evaluation tries to show that Plaintiff is in extreme distress, the "other providers who introduced fibromyalgia as a possibility did not appear to report significant pain." (*Id.*).

Reliance also explained that "[i]n reviewing the documentation provided by Ms. Klass' treatment providers, there appears to be a level of impairment specific to her neck pain, back pain and a diagnosis of Fibromyalgia," but noted that "the severity is not consistent with the inability to perform the material duties of her regular occupation." (D.E. No. 32-6 at 17). Reliance further noted that "while we acknowledge the results of the Functional Capacities Evaluation conducted by Dr. Katz and consultation with Dr. Podell, noting Ms. Klass' inability to work even in limited capacity, their defined restrictions and limitations are not consistent with the series of diagnostic studies indicating mild to moderate findings." (*Id.*). And although Reliance did not dispute that Plaintiff "may have symptoms associated with her back pain and Fibromyalgia," it determined (relying, in part, on the opinions of Dr. Weisberg and Dr. Millos) that "the severity of these ailments did not preclude [Plaintiff] from *sedentary* work." (*Id.* at 18) (emphasis in original).

Given Dr. Weisberg's and Reliance's explanations for their conclusions, it cannot be said that Reliance's decision is "without reason, unsupported by substantial evidence or erroneous as a matter of law." *See Miller*, 632 F.3d at 845. Accordingly, the Court finds that Defendants' reliance on Dr. Weisberg's opinions over those of Plaintiff's treating physicians does not make its decision arbitrary and capricious.[9]

---

[9] The Court is unpersuaded by Plaintiff's questioning of Dr. Weisberg's qualifications. (*See, e.g.*, Pl. SMF ¶ 61 ("Dr. Weisberg's curriculum vitae is devoid of any reference to the conditions of Fibromyalgia or CFS/SEID."); Pl. Mov. Br. at 17 ("Dr. Weisberg, who is not an expert on Fibromyalgia . . . ."); Pl. Mov. Br. at 23 ("Dr. Weisberg, whose CV reveals no expertise or special knowledge of Fibromyalgia or CFS/SEID . . . .")). Although Plaintiff fails to cite any authority for the proposition that a reviewing physician or an administrator must have any particular qualifications, some courts have held that "the competency of the claims administrator may be relevant." *See, e.g.*,

### ii. *Defendants' Evaluation of Plaintiff's Fibromyalgia and CFS/SEID*

#### a. *The Parties' Arguments*

Plaintiff first contends that Defendants' determination is arbitrary and capricious because Dr. Weisberg (and Defendants by relying on his opinions) discounted Dr. Podell's report detailing the severity of Plaintiff's fibromyalgia. (Pl. Mov. Br. at 24-26). She argues that her complaints cannot be ignored simply because they are subjective, and that it is "especially inappropriate" to discount a claimant's subjective complaints for a condition like fibromyalgia, which is in part "characterized by subjective and variable symptoms." (*Id.* at 25). Plainitff then alleges that Defendants disregarded the CFS/SEID element of her claim, stating that Dr. Weisberg's report and Defendants' denial letter do not "analyze this condition or the extent to which it does or does not disable Ms. Klass." (*Id.* at 26-28).

Reliance agrees that it cannot ignore Plaintiff's complaints simply because they are subjective, but maintains that "those complaints, when reviewed in light of other record evidence, do not appear credible." (Def. Mov. & Opp. Br. at 14-17). And while it "has never demanded objective proof of Plaintiff's *diagnosis* of fibromyalgia or even chronic fatigue syndrome," it notes that a "fibromyalgia diagnosis is not *per se* disabling." (*Id.* at 14-15) (emphasis in original). So, Reliance argues, "[w]hile the amount of fatigue or pain an individual experiences may be entirely subjective, the extent to which those conditions limit her functional capabilities can be objectively measured." (*Id.* at 28 (citing *Balas v. PNC Fin. Servs. Grp.*, No. 10-0249, 2012 WL 681711, at *9 (W.D. Pa. Feb. 29, 2012)). It points out, for example, that "[a]lthough Plaintiff claims that she

---

*Fick v. Metro. Life. Ins.*, 347 F. Supp. 2d 1271, 1286-87 (S.D. Fla. 2004) (finding a "nurse consultant" was qualified to be an administrator). Here, the record is devoid of any evidence to suggest that Dr. Weisberg was incompetent or otherwise unqualified to evaluate Plaintiff's claim. And Plaintiff does not point to any. Accordingly, the Court rejects Plaintiff's suggestion that Dr. Weisberg was somehow unqualified to evaluate her claim. *See Verme-Gibboney v. Hartford Life & Acc. Ins.*, No. 11-3796, 2014 WL 1050618, at *7 (D.N.J. Mar. 13, 2014) (granting defendant's summary-judgment motion partly because plaintiff failed to show that the claims administrator was incompetent, unqualified, or lacked a medical background).

cannot sit for any length of time, . . . she rode in a car for almost 4 hours," demonstrating "that Plaintiff is capable of more than she claims." (*Id.* at 28). Put simply, Reliance requests proof "not of a diagnosis, but of a disability." (*Id.* at 33).

### b. Analysis

In the Third Circuit, it is arbitrary and capricious to require objective medical evidence in the context of a claim for LTD benefits based on chronic fatigue syndrome or fibromyalgia. *Mitchell v. Eastman Kodak Co.*, 113 F.3d 433, 442-43 (3d Cir. 1997) (finding that the requirement of objective medical evidence to establish the etiology of chronic fatigue syndrome, which is defined by the absence of objective medical evidence, is arbitrary and capricious); *Steele v. Boeing Co.*, 225 F. App'x 71, 74-75 (3d Cir. 2007) (finding that it was impermissible to require objective evidence for fibromyalgia, a condition based on subjective complaints of pain that cannot be proved objectively, and that the effect of such requirement would be to eliminate arbitrarily and capriciously all disability claims based on fibromyalgia); *see also Kuhn v. Prudential Ins. Co. of Am.*, 551 F. Supp. 2d 413, 427 (E.D. Pa. 2008) ("[C]hronic fatigue syndrome cases are analogous to the situation presented by fibromyalgia cases.").

Reliance argues, however, that it "has never demanded objective proof of Plaintiff's *diagnosis* of fibromyalgia or even chronic fatigue syndrome." (Def. Mov. & Opp. Br. at 15) (emphasis in original). Indeed, "Reliance has accepted that Plaintiff has the conditions." (*Id.*). Rather, it denied Plaintiff's claim because Plaintiff failed to provide objective evidence that her conditions limited her functional capabilities such that she is disabled under the Policy. (*Id.*). The distinction, therefore, is between requiring objective proof that Plaintiff has the particular conditions diagnosed and requiring objective proof that such conditions render her unable to perform the functions of her occupation.

This distinction is recognized by federal courts throughout the country. *See, e.g.*, *Williams v. Aetna Life Ins.*, 509 F.3d 317, 322-23 (7th Cir. 2007) ("A distinction exists however, between the amount of fatigue or pain an individual experiences, which . . . is entirely subjective, and how much an individual's degree of pain or fatigue limits his functional capabilities, which can be objectively measured."); *Pralutsky v. Metro. Life Ins.*, 435 F.3d 833, 839 (8th Cir. 2006) (holding it was not unreasonable for a plan to request objective and clinical evidence for a claimant diagnosed with fibromyalgia beyond doctor statements repeating the claimant's subjective complaints of pain and fatigue); *Boardman v. Prudential Ins. Co. of Am.*, 337 F.3d 9, 16 n.5 (1st Cir. 2003) ("While the diagnoses of chronic fatigue syndrome and fibromyalgia may not lend themselves to objective clinical findings, the physical limitations imposed by the symptoms of such illnesses do lend themselves to objective analysis."); *Lamanna v. Special Agents Mut. Benefits Ass'n*, 546 F. Supp. 2d 261, 296 (W.D. Pa. 2008) (same).

Moreover, courts within the Third Circuit have held that it is not an abuse of discretion to require objective evidence that a condition—including chronic fatigue syndrome and fibromyalgia—is sufficiently disabling to warrant an award of disability benefits. *See Balas*, 2012 WL 681711, at *9-10 (upholding denial of plaintiff's LTD benefits for chronic fatigue syndrome and fibromyalgia based in part on plaintiff's failure to "provide objective evidence of her inability to perform the material duties of her regular occupation"); *Wernicki-Stevens v. Reliance Standard Life Ins.*, 641 F. Supp. 2d 418, 426-27 (E.D. Pa. 2009) (finding no evidence that Reliance's discontinuation of plaintiff's LTD benefits was based on a lack of a known etiology for either chronic fatigue syndrome or fibromyalgia, but instead was based upon the results of a functional capacity examination that demonstrated plaintiff was capable of full-time sedentary work); *Gibson v. Hartford Life & Acc. Ins.*, No. 06-3814, 2007 WL 1892486, at *13 (E.D. Pa. June 29, 2007)

(where Hartford relied, in part, on a physical-capacities-evaluation form in which the consulting physician assessed the frequency with which the plaintiff with fibromyalgia could perform basic physical activities, such as grasping with her hands and exercising fine motor skills with her fingers, the decision that the claimant could perform other work was not arbitrary and capricious).

Here, Plaintiff sought LTD benefits on July 31, 2014, claiming that she is "totally disabled and unable to work." (Pl. SMF ¶ 28; Pl. Mov. Br. at 21). Yet, on August 21, 2014, she was able to ride in a car nonstop for four hours. (Pl. SMF ¶ 38). Dr. Katz's APS accompanying Plaintiff's LTD claim reported that Plaintiff (i) can sit, stand, walk and drive each for one-to-three hours in an eight-hour day; (ii) can frequently drive and use foot controls; (iii) can occasionally bend, squat, climb, reach above shoulders, kneel and crawl; lift or carry ten pounds and occasionally carry small objects (a level consistent with sedentary work); (iv) was not limited in her ability to relate to other people beyond giving and receiving instructions; and (v) was moderately limited in her ability to perform simple and repetitive tasks as well as complex and varied tasks. (D.E. No. 32-6 at 68-69). Moreover, surveillance suggests that Plaintiff was not limited in her daily living. On August 20, 2014, for example, Marshall observed Plaintiff going to physical therapy, a reflexology appointment, entering a hearing aid business, and getting gas. (*Id.* ¶ 34).

Additionally, on September 30, 2014, Dr. Becker noted a "tender spot in the classical distribution of Fibromyalgia," but stated that Plaintiff "appears to be doing relatively well with the current medical program." (*Id.* ¶ 47). And although Dr. Podell (who last saw Plaintiff in December 2014) concluded that Plaintiff's symptoms are "consistent with severe functional limitations and not being able to work on a regular basis at any job" (D.E. No. 32-11 at 4-39), Dr. Becker (also in December 2014) opined that (i) Plaintiff "has no objective muscle weakness or pain"; (ii) she "does have tender spot in the classical distribution of fibromyalgia, but no active inflammatory

arthropathy is appreciated"; (iii) her "[n]eurological examination is within normal limits"; and (iv) her "laboratory tests performed by the specialist were all negative" (D.E. No. 32-10 at 61). Significantly, Dr. Becker "recommended to her to try to find some form of discipline action, whereby she does more than just sit all day in front of the television set." (*Id.*). Dr. Weisberg, too, "believe[d] the prognosis is good if [Plaintiff] returns to a working environment" and opined that Plaintiff had "the work capacity on a full time consistent basis" with certain restrictions that he outlined in his report. (D.E. No. 32-11 at 47-56).

Under these circumstances, the Court cannot find that Defendants' decision is "without reason, unsupported by substantial evidence or erroneous as a matter of law." *See Miller*, 632 F.3d at 845. Accordingly, Defendants' evaluation of Plaintiff's fibromyalgia and CFS/SEID is neither arbitrary nor capricious. To hold otherwise would mean to substitute the Court's judgment for that of Defendants'—which the Court cannot do. *See Quinlan*, 2015 WL 519430, at *6 (noting that the Court's scope of review is narrow, and it "is not free to substitute its own judgment for that of the defendants in determining eligibility for plan benefits"); *Aristone*, 2016 WL 4265718, at *6 ("Indeed, a decision may be disturbed only if it was unreasonable.").

### iii. *Defendants' Vocational Analysis*

#### a. *The Parties' Arguments*

Plaintiff's argument is twofold. First, she argues that Defendants' denial of her claim is arbitrary and capricious because Reliance "neglected a fundamental aspect of analyzing this claim"—namely, that it failed to analyze Plaintiff's capabilities in performing the duties of her occupation given her conditions, restrictions, and limitations. (Pl. Mov. Br. at 28-30). Next, she asserts—for the first time in her reply brief—that Defendants' decision should be rendered "null

and void" because Defendants failed to consider Plaintiff's ability to meet the "cognitive demands" of her occupation. (Pl. Rep. & Opp. Br. at 24).

In its cross-motion, Reliance emphasizes that the Policy does not require it to consider Plaintiff's specific duties at Toys "R" Us; rather, it must consider "the [employee's] occupation as it is normally performed in the national economy." (Def. Mov. & Opp. Br. at 24) (citing the Policy). So, in accordance with the Policy, Reliance first "considered the job description from her employer and determined that her occupation was best designated as a sedentary occupation." (*Id.* at 19). It then determined that, "[a]s performed in the national economy, Plaintiff's occupation is a combination of a 'Database Administrator' and 'Manager, Sales'"—again, a sedentary position. (*Id.* at 25). As such, Reliance's review centered on whether Plaintiff was disabled "from her sedentary level regular occupation." (*Id.* at 19). Ultimately, it denied Plaintiff's claim because it deemed Plaintiff capable of performing the material duties of her sedentary regular occupation as performed in the national economy. (*Id.*).

### b. Analysis

#### 1. Defendants' Evaluation of Plaintiff's Capabilities Given Her Conditions, Restrictions, and Limitations

Plaintiff avers that Defendants' determination is arbitrary and capricious because they failed to analyze whether she "was capable of performing the duties of her occupation given her conditions, restrictions, and limitations." (Pl. Mov. Br. at 28-30). The Court disagrees.

Plaintiff is correct that "it is essential that any rational decision to terminate disability benefits under an own-occupation plan consider whether the claimant can actually preform the specific job requirements of a position." (Pl. Mov. Br. at 28-29 (citing *Miller*, 632 F.3d at 854-55)). Plaintiff is also correct that under *Miller*, an administrator "must explain how [Plaintiff] can perform the functions of her job in light of her impairments in order for denial of the claim to be

considered by a reviewing court to be 'reasoned.'" (*Id.* at 28 (citing *Miller*, 632 F.3d at 854-55)).

Moreover, even where a vocational analysis is not required by the plan, a "[d]efendant is still obligated under ERISA to provide a well-reasoned explanation of its decision including which sedentary jobs [p]laintiff is capable of working, with or without accommodations." *Dunn v. Reed Grp.*, No. 08-1632, 2009 WL 2848662, at *11 (D.N.J. Sept. 2, 2009) (citing *Havens v. Cont'l Cas., Co.*, 186 F. App'x 207, 212-13 (3d Cir. 2006)).

Contrary to Plaintiff's contentions, the Court finds that Reliance's evaluation of Plaintiff's capabilities given her conditions, restrictions, and limitations is not arbitrary and capricious. As required by law, Reliance's final denial letter provides a well-reasoned explanation of its decision. It first explains that Reliance considered "all of the medical evidence," including Dr. Weisberg's report, treatment records from Doctors Millos, Katz, Murray, Dennis, Becker and Podell, and MRIs. (D.E. No. 32-6 at 13-19). It then quotes several doctors' opinions relevant to Plaintiff's conditions, restrictions, and limitations. (*See id.* (quoting Doctors Katz, Podell, Millos, and Weisberg)). It notes that, in accordance with the terms of the Policy,[10] a Reliance vocational specialist reviewed Plaintiff's job description and determined that—as performed in the national economy—Plaintiff's occupation was best designated as a "Sales Manager." (*Id.* at 14). It classifies Plaintiff's occupation as sedentary (which Plaintiff does not dispute) and further clarifies that Reliance "utilized the vocational evidence combined with the medical records received from her treatment providers to determine if she qualified for LTD benefits." (*Id.*). Finally, it outlines

---

[10]    The Policy, which the Court construes as a contract, states that Reliance "will look at the [employee's] occupation as it is normally performed in the national economy, and not the unique duties performed for a specific employer in a specific locale." (Policy at 10); *see Becknell v. Severance Pay Plan of Johnson & Johnson & U.S. Affiliated Cos.*, 644 F. App'x 205, 213 (3d Cir. 2016) ("An ERISA plan should be construed as a contract, looking to the terms of the plan as well as to other manifestations of the parties' intent.") (citing *US Airways, Inc. v. McCutchen*, 133 S. Ct. 1537, 1549 (2013)).

the accommodations Plaintiff would require in returning to work on a full-time consistent basis. (*See id.* at 18). In light of these undisputed facts, Plaintiff's contention is unpersuasive.

## 2. *Defendants' Evaluation of Plaintiff's Cognitive Capabilities*

Plaintiff then argues—for the first time in her reply brief—that her "occupation entails far more than just sedentary physical activity, but also cognitive demands which require focus, energy, and the ability to multi-task," and Defendants' failure to consider these cognitive demands renders their decision "null and void." (Pl. Rep. & Opp. Br. at 24).[11] Despite omitting this argument from her moving brief, Plaintiff describes her occupation's cognitive demands as "[c]ritical[]." (*Id.*).

As a threshold matter, the Court notes that a party waives any arguments it fails to develop in its opening brief. *Brown v. Mercadante*, No. 16-2604, 2017 WL 1437198, at *2 n.5 (3d Cir. Apr. 24, 2017); *see also Laborers' Int'l Union of N. Am. v. Foster Wheeler Corp.*, 26 F.3d 375, 398 (3d Cir. 1994) ("An issue is waived unless a party raises it in [her] opening brief, and for those purposes a passing reference to an issue will not suffice to bring that issue before this court."). "The rationale for this rule is self-evident-because . . . a party opposing summary judgment has no opportunity to respond to newly minted arguments contained in reply briefs." *Bayer AG v. Schein Pharm., Inc.*, 129 F. Supp. 2d 705, 716 (D.N.J. 2001), *aff'd*, 301 F.3d 1306 (Fed. Cir. 2002). But here, in their own reply—despite this Court's Order instructing Defendants to submit a reply brief only in further support of their own cross-motion and prohibiting them from further opposing Plaintiff's motion—Defendants nevertheless opposed Plaintiff's newly minted argument. (*See* D.E. No. 31, Letter Order at 2; Def. Rep. Br. at 19). In doing so, Defendants further opposed

---

[11]     To be sure, Plaintiff's moving brief acknowledges that her previous occupation involved "a high level of cognitive skills." (Pl. Mov. Br. at 4). Plaintiff's acknowledgement, however, is different from her argument in her reply brief that Defendants' failure to consider these cognitive demands renders their decision "null and void" (Pl. Rep. & Opp. Br. at 24).

Plaintiff's motion and thereby obviated any fairness concerns. So, the Court will address Plaintiff's newly raised argument.

Even if not waived, Plaintiff's newly raised argument is unavailing. As Defendants point out, it is Plaintiff's burden to prove a disability. (Def. Rep. Br. at 19); *Molinaro v. UPS Health & Welfare Package*, 918 F. Supp. 2d 291, 295 (D.N.J. 2013) ("[T]he plaintiff retains the burden to prove that he is entitled to benefits, and that the plan administrator's decision was arbitrary and capricious."); *Zurawel v. Long Term Disability Income Plan for Choices Eligible Emps. of Johnson & Johnson*, No. 07-5973, 2010 WL 3862543, at *11 (D.N.J. Sept. 27, 2010) ("It is not [d]efendants' burden to determine the existence of [p]laintiff's disability; it is enough that they determine, reasonably, that Plaintiff has failed to satisfy his burden of proof.").

Here, Dr. Podell is the only physician to opine that Plaintiff "has reduced cognitive abilities with relation to memory and arithmetic skills secondary to her illness." (D.E. No. 32-11 at 17-18). But his conclusions are not supported by any treatment records. (Def. Mov. & Opp. Br. at 35 ("Indeed, there are no treatment records from Dr. Podell . . . .")); *see also Dunn*, 2009 WL 2848662, at *14 (rejecting doctor's opinion that plaintiff had arthritis because doctor's "conclusion is not supported by any treatment records or test results"). And, as Defendants aptly note, "Plaintiff never underwent neuropsychological testing. Nor do the treatment records document any treatment for cognitive complaints. Certainly, Plaintiff's brief does not cite to any record evidence supporting such a claim." (Def. Rep. Br. at 19). Tellingly, Plaintiff's submissions in support of her motion are entirely devoid of any record citations demonstrating that Plaintiff sought treatment for any cognitive complaints. Moreover, the authority on which Plaintiff relies is distinguishable

from the facts at hand.[12]  Accordingly, the Court finds that Plaintiff failed to meet her burden of proving that she is disabled because her impairments prevent her from meeting the cognitive demands of her occupation.

### iv.  *Defendants' Consideration of Surveillance Videos*

#### a.  *The Parties' Arguments*

Plaintiff contends that Defendants "misused" surveillance to deny her claim, rendering their decision arbitrary and capricious.  (Pl. Mov. Br. at 30-32).  Specifically, she asserts that Reliance had (i) "no basis to deny her claim based on the fact that she went to physical therapy, ran short and basic errands, or took car rides lasting 14 minutes or less"; and (ii) "no grounds to terminate [her] benefits based on the fact that she did not get out of [the] passenger's seat of a car during a less than four hour trip."  (*Id.* at 30-31).

In opposition, Defendants note that surveillance is a "legitimate investigatory tool used by plan administrators," and argue that the video surveillance is only one of many factors Reliance considered (and "not even the primary evidence on which Reliance relied").  (Def. Mov. & Opp. Br. at 20-21; Def. Rep. Br. at 17).

---

[12]     In *Miller*, for example, there was no question that plaintiff met his burden of proving a disability.  There, the record was replete with Miller's diagnosis as "suffering from anxiety disorder and brief reactive psychosis . . . caused by physical fatigue, sleep deprivation, and emotional stress."  *Miller*, 632 F.3d at 841-43.  Even defendant's independent medical examiner—who concluded that Miller was not disabled from his occupation as a pilot—"also recognized that Miller was at risk of having another psychotic episode if he was exposed to physical fatigue, sleep deprivation, and emotional stress."  *Id.* at 855.  The Court concluded that defendant's decision was "not reasoned," because it was troubled by the "striking incongruity between [the independent medical examiner's] conclusion that Miller could return to work as a pilot—having to operate under considerable stress—and his recognition that stress, fatigue, and sleep deprivation could prompt another psychotic episode."  *Id.*

Plaintiff's reliance on *Lamanna v. Special Agents Mut. Benefits Ass'n* is also inappropriate, because there (among other things) (i) three different independent medical examiners disagreed on the plaintiff's ability to return to work and none of their opinions were "supported by even the most cursory explanation of how the doctors arrived at their conclusions"; and (ii) there was no formal job description in the record.  546 F. Supp. 2d at 296-97.  Finally, Plaintiff's reliance on *Plank v. Devereux Found.* is likewise unsuitable, because (i) unlike Ms. Klass, the plaintiff there asserted both physical and mental impairments at the time of her LTD application; and (ii) in any event, the court remanded the case without rendering a determination because it found that the administrator had applied an incorrect occupational standard.  89 F. Supp. 3d 705, 708, 715-16 (E.D. Pa. 2015).

### b. Analysis

The law is clear: video surveillance is a proper method of investigating disability insurance claims, and plan administrators may consider such evidence in conjunction with the entire record. *Russell v. Paul Revere Life Ins.*, 288 F.3d 78, 81 (3d Cir. 2002); *see also Mozdzierz*, 2014 WL 7177326, at *13 ("Surveillance is a legitimate investigatory tool used by plan administrators."); *Palma v. Harleysville Life Ins.*, No. 12-2337, 2013 WL 6840512, at *10 (D.N.J. Dec. 23, 2013) (granting defendant's summary-judgment motion because defendant's decision was "consistent with the terms of the [p]olicy, the medical evidence presented, and the video surveillance obtained"); *Wright v. Hartford Ben. Mgmt. Servs.*, No. 11-0602, 2012 WL 1680094, at *7 (D.N.J. May 11, 2012) (rejecting plaintiff's argument that defendant's consideration of surveillance footage was improper because it was "one piece of evidence among many"); *Eppley v. Provident Life & Acc. Ins.*, 789 F. Supp. 2d 546, 573-74 (E.D. Pa. 2011) ("Taking the video in conjunction with the remainder of the record, [d]efendant maintained a more than reasonable basis on which to find [p]laintiff not totally disabled.").[13]

Given these precepts, the Court must reject Plaintiff's argument. Nothing in the record suggests that Reliance "misused" surveillance to deny her claim. In fact, Reliance's final denial letter (which outlines the documents it considered in rendering its decision) nowhere mentions the surveillance videos. (*See* D.E. No. 32-6 at 13-19). Instead, the surveillance videos became part of a much larger record, which (as Reliance notes) includes Dr. Weisberg's report, treatment

---

[13]     Plaintiff relies on *Higgins v. UNUM Life Ins. Co. of Am.* for the proposition that "[c]ourts in this Circuit have also spoken specifically about inappropriate surveillance in Fibromyalgia cases." (Pl. Mov. Br. at 31 (citing No. 02-1842, 2003 WL 22283498, at *1, 4 (E.D. Pa. Oct. 2, 2003))). Plaintiff's reliance, however, is inappropriate. Rather than "sp[eaking] specifically about inappropriate surveillance in Fibromyalgia cases," the court rejected defendant's assertion that plaintiff was "observed *working* eight hours per day" because the assertion was not supported by the surveillance footage. *Id.* at *4. The Court noted that the "videotapes . . . disclose only limited activity by Plaintiff . . . [and] throw no light on whether Plaintiff worked . . . or whether she merely rested . . . ." *Id.* Notably, the court took no position on the appropriateness of video surveillance specific to fibromyalgia cases. *See id.* at *1-5.

records from Doctors Millos, Katz, Murray, Dennis, Becker and Podell, MRIs, and a vocational assessment. (*See id.*). Under these circumstances, Plaintiff's argument fails.

Moreover, courts are reluctant to deem a defendant's denial of benefits arbitrary and capricious where a surveillance video indicates that a claimant's physical limitations do not match either her own description of her limitations or the opinions of her treating physicians. *DeLong v. Aetna Life Ins.*, No. 05-3371, 2006 WL 328348, at *4 (E.D. Pa. Feb. 9, 2006), *aff'd*, 232 F. App'x 190 (3d Cir. 2007); *see also Mozdzierz*, 2014 WL 7177326, at *13 (rejecting plaintiff's claim that defendant "improperly" terminated her benefits and granting defendant's summary-judgment motion in part because the "surveillance video . . . calls into serious question [p]laintiff's claims"). Here, one of the surveillance videos depicts activity levels inconsistent with Plaintiff's complaints. According to Plaintiff, on her "good days," she can "drive a car for about 30 minutes before feeling worse. But even on a 'good day' she cannot sit in a chair . . . for extended periods of time without getting worse." (D.E. No. 32-11 at 11). Yet, surveillance revealed that on August 21, 2014, she rode in a car for approximately four hours. (Pl. SMF ¶ 38). Thus, Plaintiff's claim again fails.

In short, the Court finds that there is no indication that Reliance "misused" surveillance—as one piece of evidence among many—to terminate Plaintiff's claim. As such, Defendants' reliance on the surveillance videos does not render their decision arbitrary and capricious.[14]

## IV. CONCLUSION

For the above reasons, the Court DENIES Plaintiff's motion for summary judgment and GRANTS Defendants' cross-motion. An appropriate order accompanies this Opinion.

s/Esther Salas
**Esther Salas, U.S.D.J.**

---

[14] Because the Court grants Defendants' motion finding that their determination was not arbitrary and capricious, it need not address Matrix's argument that it is not a proper party to this suit (Def. Mov. & Opp. Br. at 10-12), nor Plaintiff's argument that Defendants failed to abide by their procedures manual (Pl. Mov. Br. at 32-33).